May I please report? My name is Jay Oskavich, and I'm appearing on behalf of Thomas Bolin. This morning I'm asking you to vacate the judgment and re-manicate to the district court with instructions that I vacate two special conditions and supervise release. These conditions are Special Condition 3, which prohibits me, Mr. Bolin, from posting on or uploading to any internet website or transmit by any electronic means, including but not limited to email and text messaging, any statements or other content, whether verbal, pictorial, or otherwise, that promotes or endorses violence, unlawful activity, or any groups that espouse such ideas. And we're also challenging Special Condition 4, which requires him to participate in the probation office's computer and internet monitoring program. The events leading to Mr. Bolin's arrest began on March 15th, 2019, when the attacks on two mosques in Christchurch, New Zealand were live-streamed on Facebook. Mr. Bolin had nothing to do with those attacks. He did, however, comment on them and managed a Facebook group in which other people commented on the attacks. Following posting on the site... ...that he made, which are part of the record, were protected, First Amendment-protected statements themselves. I understand that, and it's important that those comments are not directly before us, and he's not, he was not prosecuted for them. But is it your view, your position, that they were all protected by the First Amendment? That is correct, Your Honor. That is one of our positions, is that those statements were protected by the First Amendment. Since you're aware of them, I won't necessarily go through them right now. A war is coming, being ignorant of it is not protection from it, connected with images of Christchurch massacred, and pictures of firearms, and photos of a red devil, that's not incitement to murder. No, Your Honor, I would say that they are not. And even if it was, as you characterized it, incitement, that in itself is not a crime that will be protected. It doesn't go so far as to be something that the First Amendment would prohibit. Or if, as the District Attorney... You don't mean the First Amendment would prohibit, you mean the First Amendment protects it. Go ahead, I'm sorry. Yes, that is correct, Your Honor. Thank you for correcting me on that. That's all right, that's all right. The First Amendment does not prohibit... Let me ask you this, just to follow up. Would your answer be different, that is, those statements would still be protected by the First Amendment if they were made while he was on supervision? Well, right now, if he were to make those statements, it would be a violation of, possibly be a violation of Special Condition 3. And that's the problem that we have right now, is that those statements, he would not be allowed to make, or other statements like that. And within our brief, we even pointed out various statements... made while he was under supervision to violate Special Condition 3. Because it's possible that a probation officer or the court might interpret them as promoting violence or supportive of violence. As written, this condition... I guess I'm not being clear. Is it your position that, as a supervisee, he has a right to make those statements? Or can the court curtail the making of such statements? I would say that it's overbroad in this case, Your Honor, and vague. First, we don't know what statements exactly would be prohibited. It's rather unclear exactly what kind of statements he can make without fear of... Well, suppose one could fashion a sufficiently specific condition. I guess there are two questions. One is, does the court have the power to prohibit statements that incite violence? And then the second question is, can it be done in a way that is sufficiently specific to give the supervising notice? The way I understand your question, Your Honor, if I may, is you are in a sense asking me to try to rewrite the condition. And there are two ways that I'd like to answer it. The first, I would say, no, and that this condition should be disclosed of completely and not imposed. But I don't think that would satisfy... be a satisfactory answer for you. I'm not... I don't know. I'm asking the question. Right. If we were to try and fashion a better condition, one that might be clearer, I think we can look towards several statutes that are in place, as well as a mandatory condition that prohibits him from committing another federal, state, or local crime. When imposing the condition, Judge Larimer referenced the Hate Crimes Act. Now the Hate Crimes Act really does not address speech. But it does identify groups that you're not supposed to direct violence towards, commit acts of violence. And we can use that to identify how the speech should not be directed towards those particular groups. And we can use that to identify them. Then if we were to look at some of the other statutes that we have in place, for example, 18 U.S.C. Section 115A, which deals with assaulting or threatening to assault a federal official, or Section 878, which deals with threats against the government. This would prohibit certain types of speech that is specifically threats made towards, in this case, government officials. But we can then rewrite this possibly towards the other types of groups that the court was looking to protect. And I think that might be a clearer way if we felt that there was a need to have this kind of condition. But I still firmly believe that this condition is still a bit vague and still goes beyond what should be done because it doesn't really relate to the offense that Mr. Bowen committed, which was sitting in the back of a vehicle operated by members of the Joint Terrorism Task Force. Well, he didn't get in the back of the vehicle because he had been speeding in his own. He came to the attention of the Joint Strike Force with regard to terrorism matters because of his postings on its Facebook page. So I don't know how this is in some way related to some of, not necessarily his criminal activity, but the underlying circumstances around which the criminal activity occurred. You would concede that the FBI had a legitimate interest in questioning him, wouldn't you? Yes, I'm not. Because he did, because he pled guilty. If the FBI hadn't been asking him material questions, we know that he could have lied to them. But you can see that he pled guilty to lying to the FBI. They were asking him questions. Well, what were they asking him questions about? They asked him questions about whether he owned a firearm and or why were they asking that? Because he had a Facebook page that referred to a Muslim imam as a sand digger and promoted and said that the fellow at Christ Church had really done a good job and that they ought to replicate it in the United States. So I don't understand how that's not in some way connected to what his criminal activity was. It seems to me it would be incredibly strained of reading to say that it wasn't in some way connected to what he was up to. I would say that it becomes a bit tangential from the actual offense that he committed, Your Honor. You do? You think that's tangential? Yes, Your Honor. So question one, why was he questioned by the FBI? He was questioned based upon they were investigating some of the postings that he made on the Facebook page as well as some of the people that he was communicating with. And those questions are too tangential to his ultimate lie? I would say yes, Your Honor. I would say that they're two completely separate acts. Even if you're right, just to follow up on Judge Wesley's question, there's a nexus to the history and characteristics of the defendant, and that's a proper basis. That is correct, Your Honor. If we look at the cases where they find that there is a nexus, often there's the prior offenses that's been involved or part of the offenses involved. We look at A. Abrams where there was a nexus. You have one minute, by the way. Thank you, Your Honor. We look at some of the cases where they found where there was a nexus. Abrams, the condition was that he paid for a civil fine that was associated with the illegal abestus violation. In Dukes, he had a prior conviction of sex offense. So while he was convicted of securities fraud, they wanted him to have sex offender treatment. If we look at Malone where the defendant, a Ninth Circuit case decided by the government where he was prohibited from going to Irish pubs and the such, he was exporting firearms to the United Kingdom during the time when you had the troubles in Northern Ireland. So there's a much clearer connection to the offense itself. All right. You have some time for rebuttal. We'll hear from the government. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Can everyone hear me? Yes. I can. Thank you. My name is Tiffany Lee, and I represent the United States. Turning to Judge Chin's question, whether or not the court has the power to limit an individual's speech while they're on supervised release, I think the answer is yes. This court has said that district courts have wide latitude when it comes to crafting special conditions of supervised release. What the supervised release condition needs to be tethered to is that there has to be a reasonable relationship between the condition to the statutory factors governing sentencing. Are there cases involving a special condition of supervised release that bans hate speech or speech that advocates violence? I could not uncover specifically a condition that looks like this one. However, as cited in our brief, the right to association cases. Correct. The right to, which are, there's a couple of them, you know, specifically Ross and Showalter. They involve the right to association part of the First Amendment, and basically, you know, the analysis was the same as this court would normally undertake. They basically said that the conditions here were reasonably related to the nature and characteristics of the defendant. While they may not have been squarely on point with the offense, the issues are, are they tethered to the interests of the sentencing judge as he's considering the section 3553A factors he needs to consider when it comes to conditions of supervised release. And secondly, they determined that this type of. I don't I don't I don't have a problem with with the nexus. I am concerned about, you know, the seeming broadness of this, you know, is retweeting a tweet of the Proud Boys at a parade. Is that would that be endorsing or promoting violence? I, you know, I think, I think the concern here from the outset of this case, but the district court was concerned about was is really colored by the factual circumstances. And I think the district court even telegraphed as early as one of the parties entered into the plea agreement. I am really concerned about the type of speech that Mr. Boland has been engaging in, specifically when you couple that with the fact that. But then shouldn't the conditions of supervision have said that what I'm talking about over, but I'm looking, I won't read it. But the last I guess it's a single sentence of of of Paragraph three about not posting any any being italicized messages by on a on a Web site that's maintained by an individual or group that publicly promotes or endorses that that that unlawful activity. That is about as broad. I would assume I don't know much about the Proud Boys, but I would assume that would be the people who are standing less than six feet together before the state house in Michigan, which is a which is they do they do specifically because it's unlawful. And it's such a such broad language that it that I may perhaps perhaps the the the the the motivation for having that language there is narrow and makes sense. But I'm not sure the language makes sense. I think, you know, obviously this was actually contested before the district court. At one point in time, the district court was even considering a total ban on any participation on any social. You mean it could be worse. You mean it could be worse. I'm just, I'm just stating that in all the in the consideration of what would perhaps see no greater deprivation of liberty than is reasonably necessary for the purposes of sentencing. I think the district court crafted something in which he felt that, OK, there would be this category of messages which promote or endorse violence in which represent to him the danger zone. But otherwise, it says violence. The problem if you're rewriting it, in a sense, I'm not. It's not a criticism, but because it says endorses violence or unlawful activity that there are other places where similar language is used. But the question is whether this was crafted narrowly enough to to to survive. Review unlawful activity is a is much broader than violence. Your Honor, this is, you know, I would just say that basically the district court, you know, really worked at trying to craft something that would narrow would be narrow, but also cover. Maybe. But did did it succeed? I mean, the motive, the motivations here were good. You know, the district judge's motivations are are good. But but did he succeed in crafting something that withstands constitutional scrutiny? Your Honor, I think the government's position is that with respect to, you know, the term whenever whenever whenever an assistant United States says it's the government's position. Yeah, I'm not. Well, I will try to avoid using that verbiage in essence here to the extent that there is any issue with the contours of this condition of supervised release. Mr. Boland can always go back to the court and and seek a modification and say, listen, I've been living with this condition now for he's actually been on supervised release for almost a year. This is extremely problematic. I cannot navigate these waters without feeling that, you know, I can't do X, Y and Z. Is there any way to change this language or narrowly tailor it? And the district court does retain that discretion to modify. Let me ask you this. I mean, the you know, I had posed really two questions to your adversary. One was about the wording. But the first part really is, does a district court have have the power to say to a supervisee, you know, you can't talk, you can't speak. You can't post on the Internet this kind of speech, hateful speech. I mean, is that is that doable? I think it is doable. It's not it's not the same as something like, you know, that the Supreme Court was very concerned about in Packingham. And this court expressed concern in England. It's not a total prohibition. It's not saying you cannot go on the Internet, you know, because the risk is too high that you might engage in some sort of speech that's going to, you know, offend or hurt someone here. It's very it's it's it's definitely the district court's effort to tailor this to say when you're on the Internet, I don't want you to engage with a variety of hate speech or I don't want you to engage in posting or disseminating messages because here's the thing. He admitted during his interview, Mr. Bowen admitted during his interview with FBI that he actually did share that Christchurch video and that he posted a link to the manifesto. So, on the one hand, you can see where, you know, Mr. Obstiavich would argue, well, those were newsworthy events. You know, there were news outlets that somewhat shared the video. But in the context of Mr. Bowen with his associations with the hate groups that he was associated with, plus in the context of other comments that he had shared, it was dangerous. And, you know, and then this on top of all this, this is the man who, when asked whether or not he possessed any weapons, denied that, even though he admitted to sharing, you know, the Christchurch massacre video. Is there a difference between the fact that it's dangerous in the sense that it might that it might tip someone over the edge as opposed to that it actually plans or encourages someone to do something? In other words, the sharing of the video might trigger someone to go ahead and replicate it without necessarily saying do this, as opposed to let's get together and accomplish this. Correct. I think, I think, I think, you know, I think the district court was just very troubled by the genesis of this, the timing of all these communications, and also, quite frankly, the immediacy with a medium like the Internet. There's nothing that if you read the special condition, there's nothing that prevents necessarily Mr. Bowen from sharing messages via snail mail. It doesn't say anything about, you know, where Mr. Bowen to write a letter. Thank you, Your Honor, to write a letter and send and say, hey, let's get together. It really is, I think, trying to slow down this type of activity when it occurs on the Internet, specifically messages which promote or endorse violence, and as he defined violence, you know, spreading messages of hate. Your Honor, the government understands that these types of special conditions are to be carefully scrutinized, but it is, it's our submission that the district court's sentence should be affirmed. The government and you understand. And me. Yeah, right. Thank you. Thank you. We'll hear the rebuttal. Thank you, Your Honor. There's a number of different directions my thoughts are going after hearing the government's response, particularly regarding the overbreadth of this. One of the focuses that I think is important and it did come up is that the court really was concerned with the medium in many ways much more than the message. As the government pointed out, there are other ways that Mr. Bowen can communicate. In fact, he could communicate these messages in other ways. It would be permissible. He's now living in the Kansas City area. He could go out to the interstate and paint on a barn some of these types of messages, and that would actually be permissible. It's just that people of his generation, his age, one of the ways that they communicate with is off of the Facebook and on the Internet. It's become, as the Supreme Court has recognized and even this court, that cyberspace... Why should someone who's on supervised release who's been convicted of a crime be permitted to do that? You have one minute, by the way. One minute. Thank you, Your Honor. Which data are we talking about? Communicate on the Internet or just communicate messages? Period. Period. I mean, why should someone who's on supervised release be able to communicate messages of hate and violence? Period. Well, a supervisee may have a limited First Amendment right. He doesn't lose those rights completely. And the First Amendment is designed not to protect speech that we find friendly, acceptable, that we agree with, but is to deal with ideas, as Justice Holmes said, with ideas that we dislike and that we have problems with. And this is the whole purpose of the First Amendment. I suppose the question—I know you have limited time, and I trust that you'll get the extra 20 seconds I'm about to take. But I'm wondering how different it is in terms of what one is allowed—what the government may do in terms of someone who is incarcerated and their speech versus somebody who's on supervised release. Is it the same standard, or is it a different standard? A person who's incarcerated has even more limited access regarding their First Amendment rights. They are very—excuse me. Many inmates do not have access to the Internet. Those who do, that access is clearly restricted. So even phone calls out are restricted. So there are differences depending on where you are within the system. The idea of supervised release is that it's to help prepare you to go back out into society. I'm sorry, but one—if Judge Chin, as presider, will permit me. Sure. It talks about electronic means. Is it your understanding that the telephone conversation is electronic means? I would say yes, Your Honor. And it becomes questionable how they would monitor that, because I don't think they're actually tapping into his phone calls. But they do have authority through the computer and Internet monitoring program to examine text messages that he sends. Well, assuming they would find out about it from the recipient of such a message or somebody who overhears it, the question is whether—my question was whether it's covered. I would say that that would be an electronic means, yes, Your Honor. But we won't know that until he's dragged back to court to answer a charge of violating this condition of supervised release. Thank you. In conclusion, we just ask that you vacate the judgment and remand with instructions that the court strike these two conditions of supervision. Thank you. Interesting case. We will reserve a decision.